[846 NYS2d 95]

LaSalle Bank National Association, Formerly Known as LaSalle National Bank, as Trustee for the Certificateholders of Asset Securitization Corporation Commercial Mortgages Pass-Through Certificates Series 1997-D5, Appellant, v Nomura Asset Capital Corporation et al., Respondents.

First Department, November 13, 2007

## APPEARANCES OF COUNSEL

*Friedman Kaplan Seiler & Adelman LLP,* New York City (*Robert J. Lack, Jeffrey R. Wang* and *Laurence D. Borten* of counsel), and *Munsch Hardt Kopf & Harr, P.C.,* Dallas, Texas (*David C. Mattka* and *Richard C. King, Jr.,* of the Texas bar, admitted pro hac vice, and *Mishell B. Kneeland* of counsel), for appellant.

*Dreier LLP,* New York City (*Marc S. Dreier, Joel A. Chernov* and *Amianna Stovall* of counsel), for respondents.

## OPINION OF THE COURT

SAXE, J.P.

This appeal presents the issue of whether the common-law mitigation of damages rule justifies the complete preclusion of any award of damages to plaintiff for defendants' established breach of their contractual representations, on the ground that plaintiff failed to take available steps to avoid its damages. We conclude that the record fails to support a complete denial of any damages.

Plaintiff is the trustee for the certificateholders of commercial mortgage pass-through certificates for a pool of 155 commercial mortgage loans originated or acquired by defendant Nomura Asset Capital Corporation. Nomura pooled the loans and transferred them to defendant Asset Securitization Corporation, which in turn issued and sold as securities the certificates, representing beneficial ownership interests in the mortgage loans. Plaintiff claims that defendants breached a number of warranties and representations they made in the Mortgage Loan Purchase and Sale Agreement (MLPSA) and Pooling and Servicing Agreement (PSA) covering the sale of those securities.

The trial concerned plaintiff's claims regarding seven specific mortgage loans included in the trust. Four of those seven loans were credit lease loans, that is, mortgage loans that were made to borrowers in reliance on the credit of the commercial tenants leasing the property; these four loans were originated by another lender and purchased by Nomura for inclusion in the trust. Those loans covered one property leased by a Super Kmart and three leased by a Kmart subsidiary, Builders Square. The other three mortgage loans at issue at trial were originated by Nomura, and related to (1) the Lancers Center, a shopping center in Lancaster, South Carolina, with a Wal-Mart as its

anchor tenant, (2) a Best Western hotel called the Old Hickory Inn, and (3) a group of five mobile home parks.

Among the warranties and representations which plaintiff claims were breached by defendants is one which states that "the origination, servicing and collection of each Mortgage Loan is in all respects legal, proper and prudent in accordance with customary industry standards." With respect to those mortgage loans not originated by Nomura, namely the credit lease loans, the equivalent provision of the agreements represents that *"to the best of the Seller's knowledge,* no fraudulent acts were committed by Bloomfield, CSFB or Bostonia during the origination process of such Mortgage Loan and the origination, servicing and collection of each Mortgage Loan is in all respects legal, proper and prudent in accordance with customary industry standards" (emphasis added). Other representations and warranties at issue are (1) the provision in the MLPSA regarding the credit lease loans which states that "[t]he Tenant cannot terminate the Credit Lease for any reason" prior to payment in full of the principal and unpaid interest due on the loan (MLPSA § 2 [b] [xli] [F]); (2) the representation that "[t]he seller has no knowledge that the representations and warranties made by each related Borrower in such Mortgage Loan are not true in any material respect" (MLPSA § 2 [b] [x]); and (3) the representation that "[n]either the seller nor any affiliate thereof has any obligation or right to make any capital contribution to any Borrower under a Mortgage Loan, other than contributions made on or prior to the Closing Date" (MLPSA § 2 [b] [47vii]).

Initially, plaintiff raises no specific challenge to the trial court's finding that there was no breach of defendants' contractual representations concerning the loan secured by the mobile home parks, and, indeed, its origination was not shown to be improper or imprudent, notwithstanding some troubling particulars about the borrower and an environmental problem on one of the properties.

We affirm the finding that the mortgage loans covering the Old Hickory Inn and the Lancers Center were shown to have been imprudently made by Nomura, demonstrating a breach of the MLPSA. As to the Lancers Center, Nomura was found to have had sufficient information to know at the time of the origination of the loan that the anchor tenant at the shopping center, Wal-Mart, would likely vacate the center during the term of the loan, which in fact occurred on September 15, 1999, two years after the loan was made. As to the Old Hickory Inn,

the court found that Nomura breached various representations and warranties, including the capital contribution representation, in that it knew the borrower had breached a representation in the mortgage concerning other indebtedness, and, in addition, in that Nomura made a second loan to the borrower—which contributed to the loss of profitability of the inn—and then converted the second loan into preferred equity after the closing of the securitization.

As to the credit lease loans relating to the stores leased to Kmart and Builders Square, which loans were originated by Bostonia and later bought by defendant Nomura for inclusion in the trust, we agree with the determination of the trial court that defendants were not shown to have violated either section 2 (b) (xix) (B), in which Nomura warranted that *"to the best of [its] knowledge* . . . the origination . . . of each Mortgage Loan [was] . . . proper and prudent in accordance with customary industry standards" (emphasis added), or section 2 (b) (xli) (F) of the MLPSA, in which it represented that the "Tenant cannot terminate the Credit Lease for any reason."

Plaintiff had the burden of proving that defendants *knew*, not merely that they *should have known*, that the mortgage loans on the four Kmart and Builders Square properties were not "proper and prudent in accordance with customary industry standards." Yet, as the trial court found, nothing in the customary industry standards rendered these loans necessarily imprudent based on the facts known to Nomura, even given Kmart's rating and the discontinuation of the subsidiary's operations.

Plaintiff cannot succeed merely by arguing that even if Nomura did not know the loans were imprudent, it "should have known" this. The contractual language does not impose such a burden. Moreover, as the trial court observed, it is noteworthy that the information from which it is argued that Nomura should have known of the loans' imprudence was equally in the possession of plaintiff at the time of the securitization. To clarify: we are not holding that plaintiff also had a contractual obligation to ensure that the loans were made in accordance with industry standards. Rather, plaintiff failed to prove the falsity of Nomura's representation in the MLPSA that, to its knowledge, the origination of the credit lease loans was neither improper nor imprudent under industry standards. Accordingly, no breach of MLPSA § 2 (b) (xix) (B) was shown in regard to the credit lease loans.

As to the claimed breach of MLPSA § (2) (b) (xli) (F), in which it was represented that "[t]he Tenant cannot terminate the Credit Lease for any reason" prior to payment of all sums due, we agree with the trial court's interpretation of the provision. It cannot properly be understood as a guarantee that the tenants would never seek a judicial declaration in the context of a bankruptcy proceeding allowing the termination of the lease due to financial insolvency, or as an implicit guarantee of the seller's liability for sums due if the tenant declared bankruptcy. Rather, the words "[t]he Tenant cannot terminate the Credit Lease for any reason" are better understood to simply represent that there is nothing in the underlying leases entitling the tenant to unilaterally terminate them. While the tenant did "terminate" the leases with the approval of the bankruptcy court, we agree with the trial court's conclusion that this act did not create a breach by Nomura of the MLPSA.

### Damages

Since plaintiff established defendants' breach of their contractual representations with regard to two of the mortgage loans, the question then becomes the extent of plaintiff's damages arising from those breaches. This question requires consideration of both plaintiff's proof of its damages and defendants' claim that plaintiff's right to damages must be reduced or extinguished due to a lack of diligent effort on plaintiff's part to mitigate its damages (*see Cornell v T.V. Dev. Corp.*, 17 NY2d 69, 74 [1966]).

Plaintiff offered its calculations of damages derived from the unpaid balances, interest, advances and fees due on the loans, deducting the amount recovered from the sale of each property. The critical issue is whether or to what extent plaintiff unreasonably delayed in notifying defendants of the claimed breaches, or in taking other necessary steps to protect the value of the investment property, thereby unreasonably failing to mitigate damages, so as to preclude any award of damages.

Initially, we reject plaintiff's contention that the trial court held, either explicitly or implicitly, that the prompt notice provision of the Pooling and Servicing Agreement was a condition precedent to recovery. The operative analysis, both sides recognize, is a mitigation of damages approach. It was defendants' burden to establish not only that plaintiff failed to make diligent efforts to mitigate its damages (*Cornell* at 74), but also the extent to which such efforts would have diminished its damages

(*see Okun v Parker Hardware Co.*, 50 AD2d 781 [1975]). Moreover, if plaintiff reasonably made such diligent efforts to mitigate, it does not matter if, in retrospect, another, better means of limiting the financial injury was possible (*see Smith v Positive Prods.*, 419 F Supp 2d 437, 449-450 [SD NY 2005]).

We agree with plaintiff that the record does not support the complete elimination of plaintiff's entitlement to damages on the ground that it failed to mitigate its damages. The record simply fails to establish that all financial injury caused by the imprudent or improper loans would have been avoided if plaintiff had made the required efforts to mitigate the damages caused by the breach.

With regard to the Lancers Center loan, the trial court declined to award any damages, with the explanation that while plaintiff gave notice of the breach to defendants on July 24, 2003, it could have provided such notice on September 15, 1999 (when anchor tenant Wal-Mart first vacated the premises), and that it definitely had enough information by 2002. (The loan went into special servicing on March 11, 2002, and the property was foreclosed on September 3, 2002.)

Notably, however, neither Wal-Mart's abandonment of the property with other tenants following it, nor the borrower's default, in themselves gave plaintiff a basis to demand repurchase. The obligation to provide defendants with notice of a breach of the agreements so as to invoke defendants' obligation to cure or repurchase could only arise *when plaintiff could reasonably be charged with having a valid basis to establish the breach.* To arrive at that juncture, plaintiff had to possess enough facts to permit a grounded assertion that at the time Nomura originated the loan, it knew that the origination of the loan was imprudent under customary industry standards, because of its failure to take into account the likelihood that anchor tenant Wal-Mart would vacate the center during the term of the loan. In addition, before it may reasonably be expected to have demanded the repurchase of a loan, plaintiff must not only have had possession of documents containing the necessary information, but must also have had a reasonable opportunity to evaluate the information and arrive at the determination that the loan had knowingly been imprudently made. Nothing in the trial court's decision reflects when that point was reached. Nor does the decision reflect any calculation of the amount by which damages could have been reduced by diligent efforts. Our review of the record does not support a conclusion

that plaintiff could have avoided all economic injury by more timely notification once it became aware of the breach.

With regard to the Old Hickory Inn, the trial court expressed the view that the loan could have been repurchased by Nomura with no loss after the borrower declared bankruptcy and the loan was transferred to special servicing in 1998, because the property was then valued at $3 million, which was greater than the balance of the loan. The trial court adopted defendants' argument that plaintiff had allowed the property to deteriorate and lose value during the intervening period, until the loan was liquidated in December 2001.

Here, too, however, the salient point is whether plaintiff unreasonably failed to timely take steps it reasonably ought to have taken to limit its damages. That Nomura theoretically *could have* repurchased the loan without loss at the time of the default is irrelevant. The question is, when did plaintiff have the information to justify requiring its making the repurchase demand of Nomura, and how much of the loss could have been avoided by reasonably diligent efforts.

The trial court's findings offer no specifics as to the point at which plaintiff could appropriately be held chargeable with awareness of the facts necessary to support a viable claim that Nomura had imprudently originated those loans, so as to justify a demand to repurchase. As the record stands, it is premature to conclude that reasonable steps taken to mitigate damages would have resulted in no financial injury at all. While evidence that the Old Hickory Inn was allowed to languish from the time of the borrower's default in 1998, and that plaintiff improperly failed to authorize basic repairs, is appropriately offered in the context of the mitigation of damages analysis, the evidence fails to establish that reasonable efforts to mitigate upon becoming aware of the breach would have avoided all financial injury.

We reject plaintiff's challenges to the evidentiary rulings made by the trial court as to the admission of documentary evidence (*see Pencom Sys. v Shapiro*, 237 AD2d 144 [1997]; *People v McKissick*, 281 AD2d 212, 212-213 [2001], *lv denied* 96 NY2d 921 [2001]). We have considered the parties' additional arguments and find them unavailing.

Accordingly, the order of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered September 8, 2006, as amended by order entered October 26, 2006, which, after a nonjury trial, found for defendants, should be modified, on the law, to the extent of vacating the determination that plaintiff's fail-

ure to mitigate damages was a complete bar to recovery, and the matter remanded for a calculation of damages, and otherwise affirmed, without costs.

FRIEDMAN, MARLOW, SULLIVAN and MCGUIRE, JJ., concur.

Order, Supreme Court, New York County, entered September 8, 2006, as amended by order entered October 26, 2006, modified, on the law, to the extent of vacating the determination that plaintiff's failure to mitigate damages was a complete bar to recovery, and the matter remanded for a calculation of damages, and otherwise affirmed, without costs.