# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| STANDARD GENERAL L.P., STANDARD GENERAL MASTER FUND L.P., P STANDARD GENERAL LTD., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 11287-CB |
| DOV CHARNEY, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 19, 2017
Date Decided: December 19, 2017

Raymond J. DiCamillo & Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Shannon Rose Selden, Derek Wikstrom & Justin Horton, DEBEVOISE & PLIMPTON LLP, New York, New York; *Attorneys for Plaintiffs*.

Mark M. Billion, BILLION LAW, Wilmington, Delaware; *Attorney for Defendant*.

**BOUCHARD, C.**

In June 2014, the board of directors of American Apparel, Inc. suspended its founder, Dov Charney, from his position as Chief Executive Officer for alleged misconduct. Hoping to take control of the Company, Charney teamed up with Standard General, L.P., an investment firm. Charney borrowed approximately $20 million from Standard General to increase his holdings to close to 43% of the Company's outstanding shares in contemplation of running a proxy contest to replace the board that suspended him.

In July 2014, after the Company fought back, Charney, Standard General, and American Apparel entered into a "Standstill Agreement." The Standstill Agreement reconstituted the board of American Apparel, established a process for a committee of the new board called the Suitability Committee to investigate Charney's alleged misconduct and decide whether he would return as CEO, and documented Standard General's commitment to invest up to $25 million in the Company. Charney and Standard General entered into a series of other agreements that, together with the Standstill Agreement, define the terms of their relationship (the "Agreements").

In December 2014, the Suitability Committee voted against reinstating Charney, and its new board terminated his employment for cause. Over the course of the next year, the parties became embroiled in litigation in multiple forums and American Apparel filed for bankruptcy. Standard General filed this action in July

1

2015, a few weeks after Charney filed suit in California asserting that the Agreements were invalid and unenforceable.

Before the Court is Standard General's motion for judgment on the pleadings for (1) a declaration that the Agreements were valid and enforceable when entered into, and (2) an award of damages for amounts due under the loan it made to Charney. In defending this action, Charney made a deliberate choice not to assert any counterclaims but has asserted a kitchen sink of eleven affirmative defenses. Charney's primary defense is that Standard General made certain oral promises to him that were false, which fraudulently induced him to enter into the Agreements.

For the reasons explained below, I conclude that Charney could not have reasonably relied on any of these alleged false promises because they directly conflict with the terms of the eight written Agreements he signed, and that his other affirmative defenses fail as a matter of law and undisputed fact. Accordingly, Standard General is entitled to entry of judgment on the pleadings.

## I.     BACKGROUND

Unless noted otherwise, the facts recited in this opinion are based on the allegations in the Verified Complaint that are admitted in defendant's answer,[1] and documents incorporated therein.[2]   Any additional facts are either not subject to reasonable dispute or subject to judicial notice.[3]

### A.     The Parties

Plaintiff Standard General L.P. is an investment firm.   Plaintiffs Standard General Master Fund L.P. and P Standard General Ltd. are two of its private investment vehicles that each hold one of the two notes at issue in this case.   I refer to these three entities together in this decision as "Standard General."

Defendant Dov Charney is the founder and former Chief Executive Officer of American Apparel Inc. ("American Apparel" or "the Company"), a Delaware corporation.   American Apparel is a clothing manufacturer, retailer, and wholesaler.

---

[1] *See In re: GR BURGR, LLC,* 2017 WL 3669511, at *5 (Del. Ch. Aug. 25, 2017) (under Court of Chancery Rule 12(c), courts view claims "in the light most favorable to the nonmoving party" and "facts admitted in the Answer are deemed true").   In responding to the allegations in Standard General's complaint, Charney misnumbered his responses.   The citations to his answer attempt to correct for this error.

[2] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citations omitted) ("plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

[3] Among the documents of which I take judicial notice are filings from related actions, including a complaint Charney filed in California state court, which is attached as Exhibit H to the complaint in this action.   *See* Compl., *Dov Charney v. Standard General L.P.*, BC 586119 (Cal. Sup. Ct. June 24, 2015) (hereafter, "CA Compl.").

**B. Charney Enters into an Agreement with Standard General After Being Suspended from American Apparel**

In the late 1980s, Charney founded American Apparel from his college dorm room. He served as the CEO from its inception until his termination in June 2014.[4] American Apparel initially grew rapidly but ran into financial difficulties in 2009, which continued through 2014. In March 2014, American Apparel held a secondary equity offering to raise capital, which diluted Charney's stake in the Company from approximately 43% to 27%.[5]

On June 18, 2014, the American Apparel board of directors suspended Charney from his position as CEO immediately after the Company's 2014 annual stockholders' meeting due to concerns that he had "allegedly violated various company policies" and breached his fiduciary duties in his management of the Company.[6] Charney maintains that those concerns were fabricated.

After his termination as CEO, Charney entered into discussions with a number of investors and sought funding to increase his stake in American Apparel in an effort to run a proxy contest to challenge the incumbent board that suspended him and take control of the Company.[7] One of the firms Charney spoke with about a

---

[4] Compl. ¶¶ 2, 18; Ans. ¶ 17.

[5] Compl. ¶ 29; Ans. ¶ 113.

[6] Ans. ¶¶ 7, 47.

[7] Ans. ¶¶ 4, 116.

4

potential investment was Standard General, which had previously approached both Charney and American Apparel about investing in the Company.[8]

On June 23, 2014, Standard General made a presentation to Charney and sent him a term sheet contemplating the purchase of approximately $20 million of American Apparel shares. According to Charney, an introductory e-mail from Standard General stated that the loan was being offered "as part of [Charney's] effort to gain control of the company."[9] Charney forwarded the term sheet to a former Chief Financial Officer of American Apparel to review.[10]

Over the next two days, Charney, Standard General, and their respective counsel began to negotiate a transaction. During these negotiations, Charney agreed to a voting arrangement in which the parties would share voting control of both his existing and any newly purchased American Apparel shares, subject to certain exceptions.[11] Charney also told Standard General he was fit to return to control of American Apparel and that the Company's allegations against him were meritless.[12] On June 25, after working through the night on its terms, Charney and Standard

---

[8] Compl. ¶ 27; Ans. ¶¶ 18, 111.

[9] Ans. ¶ 19.

[10] Ans. ¶ 21.

[11] Compl. ¶ 32; Ans. ¶ 116.

[12] Compl. ¶¶ 32-33; Ans. ¶¶ 20, 116-17.

General signed a letter agreement (the "Letter Agreement").[13]  As discussed later, Charney alleges that Standard General made a number of oral misrepresentations to him that induced him to enter into the Letter Agreement, as well as other agreements with Standard General that he entered into over the next two months.[14]

## C.  Charney Increases His Stake in American Apparel After Entering into the Letter Agreement with Standard General

The Letter Agreement contemplates that Standard General would attempt to purchase, on Charney's behalf, at least 10% of the outstanding shares of American Apparel using funds that Standard General would loan to Charney, with the newly acquired shares serving as collateral for the loan along with Charney's existing shares.[15]  The Letter Agreement also describes some of the terms of other agreements Standard General and Charney would enter into later as part of the transaction if Standard General was able to purchase the requisite number of shares, including:

- A warrant agreement "in form and substance satisfactory to" Standard General providing for the issuance of warrants to Standard General that "expire July 15, 2017 and may be cash settled" (the "Warrant Agreement");[16] and

- A cooperation agreement that would be "in form and substance reasonably satisfactory to" Standard General and require that all of Charney's American Apparel shares be "voted only as agreed among [Standard General] and Charney" but for two exceptions (the "Cooperation

---

[13] Compl. ¶ 33; Ans. ¶¶ 21-22.

[14] *See infra* Section III.C.

[15] Compl. Ex. A (Letter Agreement) ¶ 1.

[16] *Id.* ¶ 2.

6

Agreement"). Charney would be permitted to vote approximately 47.2 million shares that he already held "(i) in favor of his election as director and (ii) pursuant to the Investment Voting Agreement" that Charney had with Lion Capital.[17]

Lion Capital, referred to above, had provided an approximately $10 million loan to American Apparel and had a voting agreement with Charney.

Upon signing the Letter Agreement, Standard General began purchasing American Apparel common stock on the market. Standard General purchased approximately 16% of American Apparel's outstanding shares over a two-day period for almost $20 million.[18] On June 27, 2014, Standard General loaned Charney the aggregate principal amount of $19,556,256 so that he could purchase the new block of shares in accordance with the Letter Agreement.[19]

### D. American Apparel Adopts a Shareholder Rights Plan in Response to Charney's Increased Holdings

On June 27, 2014, Charney filed a Schedule 13D with the Securities and Exchange Commission announcing his increased stake in the Company.[20] The next day, American Apparel adopted a shareholder rights plan that "purported to

---

[17] *Id.* ¶ 3.

[18] Compl. ¶ 36; Ans. ¶¶ 24, 28.

[19] Compl. ¶ 36; Ans. ¶¶ 24, 28.

[20] Compl. ¶ 50; Ans. ¶ 25.

retroactively block consummation of the transaction contemplated by the Letter Agreement."[21]

In late June, Lion Capital called an event of default on its $10 million loan to the Company, which had the potential to trigger a cross-default on the Company's credit facility according to Standard General.[22] Charney alleges that Standard General's CEO told him during this period that Standard General was being pressured by its investors, who were unhappy with its arrangement with Charney.[23]

In the context of these events, Standard General proposed to Charney that they negotiate a settlement with American Apparel in lieu of running a proxy contest.[24] Charney alleges he was uncomfortable with the idea of settling and "felt trapped," but he nevertheless "committed himself to a course of action where he was hitched to Standard General's star."[25]

### E. The Cooperation and Standstill Agreements

On July 9, 2014, Charney and Standard General entered into two agreements. The first is the Cooperation Agreement, which was contemplated under the Letter Agreement. It governs the voting of Charney's original and newly acquired

---

[21] Compl. ¶¶ 50-52; *cf.* Ans. ¶¶ 134-36.

[22] Compl. ¶ 52.

[23] Ans. ¶¶ 29-31.

[24] Ans. ¶ 32.

[25] Ans. ¶ 30.

American Apparel shares. The second is a Nomination, Standstill, and Support Agreement (the "Standstill Agreement"). The Standstill Agreement was an agreement among American Apparel, Charney, and Standard General.

The Standstill Agreement reflects the parties' attempt to reach a settlement. It provides for a reconstitution of the American Apparel board by requiring that most of the then-current directors (including Charney) resign and by having the two continuing directors appoint five new directors to the board.[26] Three of the new directors would be designated by Standard General and two would be designated by the mutual agreement of Standard General and American Apparel. Charney was not permitted to be reappointed. The Standstill Agreement further provides that the newly-constituted board of American Apparel would establish a committee (the "Suitability Committee") charged with investigating Charney's alleged misconduct and determining whether he should be "reinstated as CEO of the Company or serve as an officer or employee."[27]

The Standstill Agreement generally prohibits Charney and Standard General from attempting to impact the corporate governance of American Apparel, including by running a proxy contest or consent solicitation against the board, until the

---

[26] Compl. Ex. G (Standstill Agreement) §§ 1(a)-(c).

[27] *Id.* §§ 5(a)-(b).

completion of the Company's 2015 annual meeting.[28]   It also calls for Standard General to "timely provide" up to $25 million to buy out Lion Capital's loan and "for any other purposes as the Board, following the Director Appointments, may determine are appropriate."[29]

On July 16, 2014, Standard General purchased Lion Capital's loan for approximately $9.5 million.[30]  It is not disputed that Standard General invested an additional $15 million in American Apparel, although Charney asserts that this additional investment should have been made a few months earlier than it was.[31]

After the Standstill Agreement was executed, Charney and other American Apparel board members resigned, and five new members were appointed to the board of American Apparel in accordance with its terms.[32]

### F. Charney and Standard General Enter into Additional Agreements Documenting the Terms of the Loan and the Warrant

On August 25, 2014, Standard General and Charney executed the remaining five agreements contemplated by the Letter Agreement.  They included:  two Notes

---

[28] *Id.* §§ 3(a)-(b).

[29] *Id.* § 2(a).

[30] Hearing Tr. 86-87 (Sept. 19, 2017) (Dkt. 200).

[31] Standard General contends it made an additional $15 million investment "into one of American Apparel's United Kingdom subsidiaries" in March 2015.  Pls.' Opening Br. 55 (Dkt. 157).   Charney asserts that Standard General "failed to invest $15 million in American Apparel for almost a year" (Ans. ¶ 69) and that the investment should have occurred by December 2014.  Hearing Tr. 71 (Sept. 19, 2017) (Dkt. 200).

[32] *See* Compl. Ex. G (Standstill Agreement) §§ 1(a)-(b); Ans. ¶¶ 37, 57.

and a related Credit Agreement setting forth the terms of Standard General's loan to Charney; a Pledge Agreement documenting the allocation of Charney's previously-owned and newly-purchased American Apparel shares as collateral for the loan; and a Warrant Agreement permitting Standard General to purchase a portion of the jointly-controlled American Apparel shares at a designated price.[33]  I refer hereafter to the Notes, the Credit Agreement, and the Pledge Agreement as the "Loan Agreements."

The Notes, which are essentially identical other than their principal amount and the identity of the lending entity,[34] provide that the principal and accrued interest of the loan are due on June 26, 2019, except in the event of a default.[35]

### G.    Suitability Committee Does Not Make a Clearance Determination

In accordance with the Standstill Agreement, the American Apparel board appointed three directors to the Suitability Committee to conduct the contemplated investigation of Charney's conduct.[36]  The Standstill Agreement provides that the Suitability Committee would "use its reasonable best efforts to conclude the

---

[33] Compl. Ex. B (Credit Agreement); Compl. Ex. C (Notes); Compl. Ex. D (Pledge Agreement); Compl. Ex. E (Warrant Agreement).

[34] The principal amount of one Note is $14,960,662.14, which is owed to Standard General Master Fund L.P.  The principal amount of the second Note is $4,595,593.86, which is owed to P Standard General Ltd.  The combined principal amount of the Notes is $19,556,256.  Compl. Ex. C (Notes) § 1.

[35] *Id.* §§ 1, 4, 11.

[36] *See* Compl. ¶ 60; Ans. ¶ 70.

11

Investigation as promptly as practicable but no later than 30 days after the date" of the agreement, "subject to any extensions that the Suitability Committee, by majority vote, determines in good faith are reasonably required to satisfy its members' fiduciary duties."[37] The investigation ultimately concluded in December 2014.[38]

In the latter part of 2014, Charney become disillusioned with the Suitability Committee's investigation and Standard General's role in American Apparel.[39] Charney viewed the management team in place as ill-equipped and thought Standard General was "dominating and entrenching itself in the company" and had deceived him by making representations it had no intention of keeping.[40] Charney alleges that the investigation was flawed and that Standard General rigged the investigation against him,[41] or failed to rig it in his favor.[42] Charney also alleges that he was not afforded a preliminary hearing or provided with access to his e-mail account as required under the Standstill Agreement.[43]

---

[37] Compl. Ex. G (Standstill Agreement) § 5(b).

[38] Compl. ¶ 60; Ans. ¶¶ 102, 144.

[39] Compl. ¶ 62; Ans. ¶ 146.

[40] Ans. ¶¶ 11-12, 146.

[41] Ans. ¶¶ 11, 41, 48, 56, 70.

[42] Ans. ¶¶ 33-34, 36, 55.

[43] Ans. ¶ 77.

12

In September 2014, Charney allegedly offered to buy out Standard General's interests in American Apparel.[44] In or around November 2014, Charney allegedly approached American Apparel with an indication of interest from a private equity firm interested in buying the Company.[45] Standard General and American Apparel did not pursue these or other overtures according to Charney.[46]

In December 2014, after it completed its investigation, the Suitability Committee voted against reinstating Charney as CEO. On December 15, 2014, the American Apparel board voted to terminate Charney's employment for cause.[47] Although it has no bearing on Standard General's motion for judgment on the pleadings, the parties disagree about whether Charney was properly terminated.[48]

## H. Litigation Ensues and American Apparel Files for Bankruptcy

On May 15, 2015, American Apparel filed an action against Charney in this Court asserting that he had breached the Standstill Agreement by, among other things, seeking the removal of members of the Company's board.[49] On June 1, 2015, this Court entered a temporary restraining order against Charney enjoining him from,

---

[44] Ans. ¶¶ 10, 83.

[45] Ans. ¶¶ 11, 84.

[46] Ans. ¶¶ 82-86.

[47] Compl. ¶¶ 66-67; Ans. ¶ 102.

[48] Compl. ¶¶ 66-67 (listing grounds for termination); Ans. ¶ 146 (maintaining the Investigation "was a sham").

[49] Compl., *Am. Apparel, Inc. v. Charney*, C.A. No. 11033-CB (June 4, 2015) (Dkt. 1).

among other things, "directly or indirectly seeking the removal of any member of American Apparel's board of directors."[50]

On June 24, 2015, Charney filed a complaint in California state court against Standard General, American Apparel, and its directors, seeking, among other things, to invalidate the Agreements (the "California action").[51] On July 11, 2015, Standard General filed this action asserting four claims for relief, which are described below.

On October 5, 2015, American Apparel filed a Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware.[52] Charney appeared in the bankruptcy proceeding and objected to American Apparel's reorganization plan, but his objection was overruled.[53] In the confirmation order, Chief Judge Shannon found that "all documents and agreements necessary to implement the Plan . . . have been negotiated in good faith and at arm's-length with the [various committees], Standard General, [and other relevant parties]," that American Apparel "exercised reasonable business judgment in determining which agreements to enter into," and

---

[50] Temporary Restraining Order, C.A. No. 11033-CB (June 1, 2015) (Dkt. 21).

[51] CA Compl. ¶¶ 142, 171, 190(f), & Prayer for Relief ¶¶ 5, 7(f).

[52] Voluntary Pet., *In re Am. Apparel, Inc.*, Case No. 15-12055 (BLS) (Bankr. D. Del. Oct. 5, 2015).

[53] *In re Am. Apparel, Inc.*, C.A. No. 15-12055 at 4-6, 28-29 (BLS) (Bankr. D. Del. Jan. 27, 2016) (OPINION).

that the issuance of "reorganized equity interests was an essential element of the Plan and is in the best interests of [American Apparel], [its] Estates and their creditors."[54]

On December 22, 2015, the California Superior Court granted Standard General's motion to stay the California action pending the outcome of this case. Discussing the Delaware exclusive forum selection clauses in the Standstill, Cooperation, and Warrant Agreements, the California Superior Court held that:

> The parties clearly intended for disputes that relate to the Agreements to be adjudicated in Delaware and under Delaware law . . . . Delaware is capable of handling the litigation, and is currently doing so. It would not only be contrary to the Agreements, but also unduly inefficient and burdensome on the courts and the parties to allow the case to proceed on a different schedule in California.[55]

## II. PROCEDURAL POSTURE

Standard General's complaint in this action asserts four claims. Count I seeks a declaratory judgment that the Agreements are valid and enforceable against Charney and that an event of default has occurred under the Notes, making them due and payable. Count II seeks damages and other relief for Charney's alleged breaches of various provisions of the Agreements. Count III seeks an injunction to enjoin Charney from taking certain actions to impair the Notes' collateral on the theory that Charney breached the implied covenant of good faith and fair dealing inherent in the

---

[54] *Id.* at 24-25.

[55] *Dov Charney v. Standard General*, Case No. BC586119 10-11 (Cal. Sup. Ct. Dec. 22, 2015) (ORDER).

Agreements. Count IV seeks damages and injunctive relief for impairment of the collateral for the Notes.

Charney was represented by counsel at the outset of this case but proceeded *pro se* for much of this litigation after his initial counsel sought and was granted leave to withdraw in November 2015.[56] On April 29, 2016, the Court denied Charney's motion to dismiss this action under Court of Chancery Rules 12(b)(3) and 12(b)(6), noting, among other things, that courts "in Delaware will enforce valid forum selection clauses."[57]

On June 22, 2016, Charney filed his answer, which asserts eleven putative "affirmative defenses": fraudulent inducement, promissory estoppel, breach of fiduciary duty, aiding and abetting, coercion, duress, breach of contract, failure to mitigate, unclean hands, unconscionability, and breach of the implied covenant of good faith and fair dealing.[58] Charney consistently has maintained throughout this litigation that he is advancing these issues *solely* as affirmative defenses and that he deliberately chose *not* to file any counterclaims in this action because he wishes to press his putative claims in the California action.[59] The Court has cautioned Charney

---

[56] Order Granting Mot. to Withdraw (Nov. 3, 2015) (Dkt. 44).

[57] Order Denying Mot. to Dismiss ¶ 7 (citation omitted) (Apr. 29, 2016) (Dkt. 78).

[58] Ans. ¶¶ 15-98.

[59] Status and Sched. Conf. 12-17 (Sept. 23, 2016) (Dkt. 101) ("I'm not making counterclaims. I'm preserving my counterclaims for my California action."); Hearing Tr. 7 (Jan. 19, 2017) (Dkt. 154) (Charney explaining that his "counterclaims will be resolved"

16

on more than one occasion that his decision to proceed in this manner could impact his legal rights and that he would be well-advised to seek the assistance of counsel.[60]

On February 28, 2017, Standard General filed the present motion seeking entry of a "judgment confirming that the written Agreements between the parties are valid and enforceable, that the loan Standard General made to Charney is due, payable, and owing, and . . . judgment at law in the amount of the loan, plus interest and attorneys' fees as provided by the Agreement."[61] On April 27, 2017, Charney filed his opposition papers. Although Charney was still *pro se* at the time, the opposition papers appear to have been prepared with the assistance of legal counsel as evidenced by their reference to pertinent legal authorities and the inclusion of an analysis from his bankruptcy counsel as an exhibit to his opposition papers.[62]

On July 10, 2017, new counsel entered an appearance to represent Charney in this action.[63] On July 11, 2017, the Court rescheduled the oral argument on Standard

---

in the California litigation); Order Implementing Special Master's Report ¶ 4 (Jan. 11, 2017) (Dkt. 145) (noting how Charney brought "a series of what are styled as affirmative defenses" and that Charney "represented that he is not asserting any counterclaims").

[60] *See, e.g.,* Status and Sched. Conf. 15-16 (Sept. 23, 2016) (noting in response to Charney's argument he was not asserting claims that "you've been throwing out a lot of things that impact your legal rights . . . and you move at your own peril when you represent yourself"); Hearing Tr. 13-14 (Jan. 19, 2017) (Dkt. 154) (advising Charney that he had twice addressed "saving [his] counterclaims for California" and suggesting that Charney "seek some legal guidance on those issues" as a Delaware decision could impact his California case).

[61] Pls.' Opening Br. 56.

[62] Def.'s Ans. Br. & Ex. 2 (Dkts. 176, 178).

[63] Entry of Appearance (Dkt. 182).

General's motion for judgment on the pleadings from July 18 to September 19 to afford Charney's new counsel additional time to prepare for the hearing and granted Charney leave to file a supplemental opposition brief by August 18.[64] Charney elected not to do so. Oral argument proceeded on September 19, 2017.

Although Standard General contends its motion covers all four of its claims, it made no genuine effort in its briefs or at oral argument to explain a basis for entry of judgment in its favor with respect to Counts III and IV. Those counts appear moot in any event because the collateral for the Notes (Charney's shares of American Apparel) was wiped out by virtue of American Apparel's bankruptcy reorganization.[65] Accordingly, this decision considers whether judgment in Standard General's favor is warranted only under Counts I and II of its complaint.

### III.     ANALYSIS

In Count I of its complaint, Standard General seeks two declarations: (1) that the Agreements are valid and enforceable and (2) that the loan it made to Charney is due, payable, and owing. In Count II, Standard General seeks a monetary judgment for the amounts due under the loan. The resolution of Count II necessarily overlaps with the declaratory relief Standard General seeks.

---

[64] Order Amending Br. Sched. (July 12, 2017) (Dkt. 184).

[65] Hearing Tr. 27-28 (Sept. 19, 2017) (Dkt. 200).

In his answer, Charney asserts eleven affirmative defenses, which are recited above.[66] Two of these putative defenses are irrelevant to the resolution of either Count I or Count II and can be addressed in short order: breach of fiduciary duty and aiding and abetting.

Charney asserts that Standard General breached fiduciary duties that it owed to him and aided and abetted a breach of fiduciary duties by American Apparel.[67] As an initial matter, Charney made no effort to explain in his opposition papers the basis for his assertion that Standard General—his contractual counterparty—owed a fiduciary duty to him,[68] or how Standard General could have aided and abetted American Apparel—as opposed to its directors—in breaching a fiduciary duty.[69]

---

[66] Ans. ¶¶ 15-98.

[67] Ans. ¶¶ 51-59, 60-64.

[68] The facts presented here do not resemble those "special" circumstances where Delaware courts have recognized a fiduciary relationship, and instead reflect an arm's length-commercial relationship where courts have consistently declined to find a fiduciary relationship. *See Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2007 WL 2982247, at *10 (Del. Ch. Oct. 9, 2007) (holding that a fiduciary relationship requires a special trust, and "a straightforward, arm's-length commercial relationship arising from contract does not give rise to fiduciary duties"); *Metro Ambulance, Inc. v. E. Med. Billing, Inc.,* 1995 WL 409015, at *3 (Del. Ch. July 5, 1995) (discussing how Delaware is wary of recognizing a "special" nature in relationships, and has only recognized it in limited circumstances like "general partners; administrators or executors; guardians; and, in special circumstances, joint venturers or principles and their agents"); *McMahon v. New Castle Assoc.*, 532 A.2d 601, 604 (Del. Ch. 1987) (Allen, C.) ("[A]ttention must be paid to the word 'special' lest the statement be thought to describe too broadly chancery's concerns.").

[69] It is well established that corporations themselves do not owe fiduciary duties. *See, e.g., Buttonwood Tree Value Partners, L.P. v. R.L Polk & Co., Inc.*, 2014 WL 3954987, at *5 (Del. Ch. Aug. 7, 2014) ("corporations do not owe fiduciary duties to their stockholders"); *In re Dataproducts Corp. S'holders Litig.*, 1991 WL 165301, at *6 (Del. Ch. Aug. 22,

Putting those issues aside, Charney has not offered any authority, and I am aware of none, to suggest that a breach of fiduciary duty or the aiding and abetting of a breach of fiduciary duty could form the basis of *an affirmative defense* as opposed to a claim or counterclaim. As such, these putative defenses fail as a matter of law.[70]

The remaining nine affirmative defenses can be grouped into two categories. The first category concerns those affirmative defenses that focus on events or circumstances that predate the execution of the Agreements and potentially could be relevant to determining their legal validity or enforceability at the time they were executed. This category consists of Charney's affirmative defenses for fraudulent inducement, coercion and duress, and unconscionability. I consider these defenses in Section III.C when addressing Standard General's request under Count I for a declaration that the Agreements are valid and enforceable, which I construe as a request for a declaration of validity and enforceability as of the time the Agreements were executed.

---

1991) ("The claims stated against Dataproducts are clearly for breach of fiduciary duty . . . . However, the plaintiffs concede that a corporation *qua* corporate entity is not a fiduciary of, and thus cannot owe a fiduciary duty to, its shareholders.").

[70] Under Court of Chancery Rule 8(c), when a "party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the Court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." Given Charney's emphatic position that he does not intend to assert counterclaims in this case, I decline to treat his designation as a mistake.

The second category concerns those affirmative defenses that focus on events or circumstances post-dating execution of the Agreements that potentially could be relevant to determining whether Standard General is entitled to relief under Count II for Charney's alleged breach of the Notes. This category consists of Charney's affirmative defenses for breach of contract, breach of the implied covenant of good faith and fair dealing, failure to mitigate, promissory estoppel, and unclean hands. I consider these defenses in Section III.D. when addressing Standard General's request under Count II for entry of judgment on the amount due under the Notes.

## A. Applicable Law

Before considering Counts I and II specifically, I address a preliminary issue to which the parties devoted little attention, namely what law governs Standard General's claims and Charney's affirmative defenses.[71] This issue implicates essentially two questions: first, whether the parties made an election as to the law governing the Agreements, which logically would apply to affirmative defenses sounding in contract; and second, whether the choice of law provisions in the Agreements are sufficiently broad to encompass Charney's affirmative defenses that sound in tort. The answer to both of these questions is yes in my view.

---

[71] Charney's answer and brief focus on Delaware law for all of his affirmative defenses. Standard General states in a footnote that New York law governs the Agreements containing New York choice of law provisions (Pls.' Opening Br. 29 n.15), but its brief otherwise focuses exclusively on Delaware law.

Three of the Agreements contain Delaware choice of law provisions: the Standstill, Cooperation, and Warrant Agreements.[72] The other five Agreements contain New York choice of law provisions: the Letter Agreement and the four Loan Agreements.[73]

Under Delaware law, the first step in a choice of law analysis is to ask whether the parties made an effective choice of law in their contracts.[74] Under New York law, where there is a New York choice of law clause, a court may apply New York law without conducting a choice of law analysis.[75] The Agreements here clearly

---

[72] Compl. Ex. E (Warrant Agreement) § 7.10 ("All disputes arising out of or relating to this agreement" shall be governed by Delaware law); Compl. Ex. F (Cooperation Agreement) § 3.13 ("All disputes arising out of or relating to this Agreement" shall be governed by Delaware law); Compl. Ex. G (Standstill Agreement) § 11 ("This Agreement shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of Delaware" and Charney consents to jurisdiction in Delaware).

[73] Compl. Ex. A (Letter Agreement) at 3 (New York law applies to "[a]ll disputes arising out of or relating to this Agreement"); Compl. Ex. B (Credit Agreement) at 2 ("This Credit Agreement shall be governed and construed in accordance with the laws of the State of New York" and Charney consents to jurisdiction in New York); Compl. Ex. C (Notes) §§ 20-21 ("this Note shall be deemed to have been made under and shall be governed by the laws of the United States, and to the extent not preempted, the laws of the State of New York in all respects, including matters of construction, validity and performance" and Charney consents to jurisdiction of New York); Compl. Ex. D (Pledge Agreement) §§ 14, 16 ("This Agreement shall be governed by and construed in accordance with the laws of the State of New York" and Charney consents to jurisdiction in New York).

[74] *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017) (citation omitted) (the first of three components in choice of law analysis is "determining if the parties made an effective choice of law through their contract").

[75] *Ministers & Missionaries Benefit Bd. v. Snow*, 45 N.E.3d 917, 918 (N.Y. 2015), *rearg. denied*, 47 N.E.3d 779 (N.Y. 2016) (holding that the inclusion of a "a New York choice-of-law clause in a contract . . . demonstrates the parties' intent that courts not conduct a conflict-of-laws analysis").

manifest an intention to have either Delaware or New York law apply by including express choice of law language.[76] Thus, the next step is to analyze whether the language in the Agreements is sufficiently broad to cover affirmative defenses incident to the contract that sound in tort.

"Under New York law, in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties."[77] "A basic precept of contract interpretation is that agreements should be construed to effectuate the parties' intent."[78] In determining whether parties intended to have an agreement govern all related claims, New York courts "have interpreted [broad] . . . choice-of-law-cum-forum-selection clauses to mandate application of New York law to all claims, including fraud claims, arising out of a transaction."[79]

Delaware law similarly stresses the importance of honoring the parties' intention in selecting the law that governs a contract and related claims. In *Abry*

---

[76] *See supra* notes 72-73 and accompanying text.

[77] *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (citation omitted).

[78] *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006); *see also Ministers & Missionaries,* 45 N.E.3d at 923 ("[W]e should apply the most reasonable interpretation of the contract language that effectuates the parties' intended and expressed choice of law.").

[79] *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC.*, 2002 WL 31819207, at *10 (S.D.N.Y. Oct. 10, 2002).

*Partners V, L.P. v. F & W Acquisition LLC*, then-Vice Chancellor Strine discussed the

importance of providing certainty to parties when they elect to choose law to govern

their contract, and how the parties' choice of law clause also should determine the

relevant law for fraud and related tort claims:

> Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship. To hold that their choice is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid.
>  . . . . To layer the tort law of one state on the contract law of another state compounds that complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote.[80]

Here, all the Agreements either have language that the choice of law covers

"all" disputes relating to the Agreements or have an express choice of law provision

accompanied by a consent to jurisdiction (by Charney) in the same forum as the

chosen law.[81]  I thus find that the language of the Agreements reflects an intention

to have the chosen law govern the contractual claims as well as affirmative defenses

incident to those claims.

This result is compelled by two additional factors.  First, under the logic of

*Abry*, the application of a contract's chosen law is particularly compelling where

---

[80] 891 A.2d 1032, 1048 (Del. Ch. 2006).

[81] *See supra* note 72-73 and accompanying text.

24

Charney, as the defendant, is not asserting any tort claims but merely bringing affirmative defenses that seek to preclude an award of relief in Standard General's favor. Second, the Agreements are interlocking and include integration clauses demonstrating the parties' clear intention to have the Agreements read together to encompass their entire relationship.[82]

For the reasons stated above, I will apply Delaware law to all claims and affirmative defenses concerning or incident to the three Agreements containing Delaware choice of law provisions and will apply New York law to all claims and affirmative defenses concerning or incident to the five Agreements containing New York choice of law provisions.[83]

## B.    Motion for Judgment on Pleadings Standard

Court of Chancery Rule 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings"[84] where there are no material issues of fact. "[U]nder Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most

---

[82] *See* Compl. Ex. A (Letter Agreement) ¶ 6; Compl. Ex. B (Credit Agreement) at 1; Compl. Ex. C (Notes) § 19; Compl. Ex. E (Warrant Agreement) § 7.6; Compl. Ex. F (Cooperation Agreement) § 3.7; Compl. Ex. G (Standstill Agreement) § 13.

[83] This approach ends up being an academic exercise because no issue has been presented where the analysis and results would differ in any material respect under either state's law.

[84] Del. Ch. Ct. R. 12(c).

favorable to the non-moving party."[85]  In determining the relevant facts, this Court may consider "document[s] attached to the complaint when the document is integral to a plaintiff's claim."[86]

Under Delaware law, which governs three of the Agreements, the "proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law,"[87] and "judgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts."[88]  Similarly, under New York law, which governs the other five Agreements, "[t]he interpretation of an unambiguous contract is a question of law for the court, and the provisions of a contract addressing the rights of the parties will prevail over the allegations in the [pleadings]."[89]

### C.    Standard General is Entitled to a Declaration Under Count I that the Agreements were Valid and Enforceable when Entered

In this section, I consider whether Standard General is entitled to a declaration that the Agreements were valid and enforceable when they were entered.  A

---

[85] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund*, *II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[86] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003).

[87] *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991) (quoting *Klair v. Reese*, 531 A.2d 219, 222 (Del. 1987)).

[88] *NBC Universal, Inc. v. Paxson Comm. Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005).

[89] *Taussig v. Clipper Gp., L.P.,* 13 A.D.3d 166, 167 (N.Y. App. Div. 2004).

necessary predicate to affording a declaratory judgment under 10 *Del. C.* § 6501 is the existence of an "actual controversy."[90] Our Supreme Court has described the criteria for there to be an actual controversy as follows:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[91]

Each of these criteria is easily met here. Charney does not argue otherwise.

The first element is satisfied because Standard General seeks declaratory relief concerning contracts to which it and Charney are both parties. The second element is satisfied because Standard General seeks declarations relating to rights under the Agreements—declarations Charney has a clear interest in contesting. The third and fourth elements are satisfied because the parties' interests are real and adverse and the controversy is ripe for judicial determination, as evidenced by the fact that Charney asserts both in this action and in the California action that the Agreements are invalid and may not be enforced against him.

It is not disputed that the Agreements are facially valid and enforceable. Rather, Charney challenges their validity and enforceability as of the time they were

---

[90] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989) (quoting *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662 (Del. 1973)).

[91] *Rollins Int'l,* 303 A.2d at 662-63.

27

signed based on three affirmative defenses (fraudulent inducement, coercion or duress, and unconscionability) that focus on events or circumstances predating their execution. I now turn to those affirmative defenses.

### 1. Fraudulent Inducement

Charney's primary challenge to the validity and enforceability of the Agreements is his fraudulent inducement affirmative defense, which alleges that Standard General made false statements to induce him to enter into the Agreements. As explained below, this defense fails under both New York and Delaware law because the oral misrepresentations Charney purports to have relied on directly conflict with the express written terms of the Agreements, making any purported reliance by Charney unreasonable.[92]

Under New York law, in order to prove fraudulent inducement, a party must establish that there was a "misrepresentation of a material fact, which was known by [the adversary] to be false and intended to be relied on when made, and that there was justifiable reliance and resulting injury."[93] New York courts find it

---

[92] Given Charney's failure to plead facts establishing that his reliance on the alleged misrepresentations was reasonable in light of the express terms of the Agreements, I do not reach Standard General's alternative argument that Charney's fraudulent inducement defense is barred by anti-reliance language in the Agreements.

[93] *Perella Weinberg Partners LLC v. Kramer*, 153 A.D.3d 443, 449 (N.Y. App. Div. 2017) (citing *Braddock v. Braddock*, 60 A.D.3d 84, 86 (N.Y. App. Div. 2009)). New York law has a "peculiar knowledge" carveout to fraudulent misrepresentation that does not apply here as Charney, a sophisticated businessman who was represented by counsel when he entered into the Agreements, was capable of understanding the plain terms of the

28

unreasonable as a matter of law to rely on oral representations that conflict "directly"[94] or "meaningful[ly]"[95] with a written agreement.

To prove fraud under Delaware law, a party must show, among other things, reasonable reliance on a false representation:

> 1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) *the plaintiff's action or inaction taken in justifiable reliance upon the representation*; and 5) damage to the plaintiff as a result of such reliance.[96]

Like New York law, Delaware law finds it "unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement. 'Fraudulent inducement is not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation.'"[97]

---

Agreements. *See, e.g., Psenicska v. Twentieth Century Fox Film Corp.*, 409 Fed.Appx. 368, 371 (2d Cir.2009) (stressing that peculiar knowledge carveout is meant to address cases where there are high costs to determining truth and is not applicable where a low cost alternative might exist); *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 115 (Del. 2012) (applying New York law and finding peculiar knowledge carveout inapplicable where "sophisticated parties could have easily insisted on contractual protections for themselves").

[94] *Ruffino v. Neiman*, 17 A.D.3d 998, 999 (N.Y. App. Div. 2005).

[95] *Urstadt Biddle Properties, Inc. v. Excelsior Realty Corp.*, 65 A.D.3d 1135, 1137 (N.Y. App. Div. 2009) (quoting *Stone v. Schulz*, 231 A.D.2d 707, 707-708 (N.Y. App. Div. 1996)).

[96] *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000) (emphasis added).

[97] *Carrow v. Arnold*, 2006 WL 3289582, at *11 (Del. Ch. Oct. 31, 2006) (quoting 17A Am.

Although Charney spends fourteen pages in his answer explaining why he believes he was fraudulently induced to enter into the Agreements, Charney's case appears to boil down to essentially three false promises that Standard General allegedly made to him orally before he signed the various Agreements: (1) that Standard General would ensure that Charney would retake control of the Company;[98] (2) that Standard General would ensure that the investigation would come out in Charney's favor and that he quickly would return as CEO of the Company;[99] and (3) that Charney could cancel all of the Agreements at any time by repaying Standard General's loan.[100] I address these alleged misrepresentations in that order.

---

Jur.2d Contracts § 214 (2006)), *aff'd*, 933 A.2d 1249 (Del. 2007); *accord Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *7 (Del. Ch. Sept. 22, 2016) (dismissing claim under Rule 12(b)(6) where "alleged promises are expressly contradicted by those same contracts").

[98] *See, e.g.,* Ans. ¶ 16 ("Standard General repeatedly promised to assist Charney in . . . regaining control over American Apparel."); ¶ 21 ("Glazek [a Standard General partner] promised that Standard General would help Charney 'take control of your company immediately.'"); ¶ 37 ("Standard General continuously promised Charney that he would be put back in control of the Company.").

[99] *See, e.g.,* Ans. ¶ 33 ("Kim [Standard General's CEO] represented to Charney that there would only be a short 'investigation,' merely to offer assurances to Standard General investors that there was at least some semblance of process, and that Charney would soon return to running the Company 'within a matter of weeks.' The investigation was in essence a charade to help expedite Charney's return."), ¶ 34 ("Kim assured Charney that . . . the end result would be a victory for Charney.").

[100] Ans. ¶ 35 ("Kim represented and assured Charney that Charney could 'tap Standard General out' at any time by repaying the Loan, and Charney would be able to cancel all of the agreements in connection with the American Apparel 'settlement.'").

### a. Representations About Retaking Control

Charney first contends that Standard General represented it would ensure that he would retake control of the Company. Charney could not have reasonably relied on any representation to this effect, however, given that the plain terms of the Agreements he signed were to the contrary, both at the outset of his contractual relationship with Standard General and as that relationship evolved.

The first of the Agreements that Charney signed was the Letter Agreement. Contrary to the notion that Standard General made an unequivocal commitment to ensure that Charney could retake control of the Company, the Letter Agreement instead makes clear that Standard General had only agreed to vote the shares in limited ways. It provides that, if Standard General were able to purchase at least ten percent of the Company's outstanding shares, then Standard General and Charney "shall enter into a cooperation agreement" with respect to both Charney's original shares and the newly purchased shares of American Apparel "in form and substance reasonably satisfactory to [Standard General] *providing that the Additional Shares and the Original Shares shall be voted only as agreed among [Standard General] and Charney*."[101] The Letter Agreement contained only two carveouts to this voting arrangement: Charney was "entitled to vote the Original Shares (i) in favor of his

---

[101] Compl. Ex. A (Letter Agreement) ¶ 3 (emphasis added).

election as director and (ii) pursuant to the Investment Voting Agreement [with Lion Capital]."[102]

The express language of the Letter Agreement undercuts any alleged promise by Standard General to fully support Charney in returning to control because it provides for a negative voting arrangement where neither party can compel the shares to be voted in a particular way. Further, by expressly permitting Charney to vote his "Original Shares" but not the newly acquired shares in favor of his election as director, the clear implication is that the parties had *not* agreed to vote the new shares even in favor of Charney's election as a director.

The Standstill Agreement similarly undercuts such a promise by expressly limiting Standard General's ability to return Charney to control. To start, the Standstill Agreement explicitly provides for Charney and certain other individuals to resign from the board shortly after the Standstill Agreement went into effect, for the board to immediately be restructured by having the continuing directors appoint new directors designated by Standard General and by the mutual agreement of Standard General and American Apparel (but in no case Charney), and for the members of the newly-constituted board to serve as directors until their "successors are duly elected and qualified."[103] The Standstill Agreement also specifically barred

---

[102] *Id.* ¶ 3.

[103] Compl. Ex. G (Standstill Agreement) §§ 1(a)-(c).

32

Standard General and Charney from soliciting proxies or consents to elect directors or taking any action to "seek the removal of any member of the Board or propose any nominee for election to the Board" until after the completion of the 2015 annual meeting.[104]

The Standstill Agreement further provides that Charney could not seek representation on the board until after the completion of American Apparel's 2015 annual meeting,[105] and that any shares held by Charney and Standard General exceeding one-third of the Company's outstanding shares be voted at meetings prior to and including the 2015 annual meeting in proportion to the votes cast by the Company's other stockholders.[106] Thus, contrary to Charney's allegation that Standard General promised to help Charney take control of the Company "immediately,"[107] Standard General could only have done so by materially breaching express terms of the Standstill Agreement.

The Cooperation Agreement formalizes the voting provisions set forth in the Letter Agreement, namely that Charney's original shares and the newly purchased shares of American Apparel be voted "in such manner as has been agreed in writing" by Standard General and Charney, with the same two carveouts set forth in the Letter

---

[104] *Id.* § 3(c).

[105] *Id.* §§ 1(c), 3(c).

[106] Compl. Ex. G (Standstill Agreement) § 4.

[107] Ans. ¶ 21.

Agreement.[108]  The Cooperation Agreement also contains a provision stating that "the Parties have not entered into any agreement or arrangement relating to the voting of the [American Apparel Shares] with respect to any matters or items of business except as set forth" in the Letter Agreement, Standstill Agreement, and Cooperation Agreement—expressly negating the existence of any unwritten understanding to ensure that Charney would retake control of the Company.[109]

In sum, given that the plain terms of the contracts expressly prevented both Charney and Standard General from seeking to retake control of the Company before the 2015 annual meeting, limited their ability to vote Charney's shares during this period, and required Standard General's agreement with respect to the voting of those shares thereafter (with certain exceptions), Charney could not have reasonably relied on any alleged promise that Standard General would ensure that he would be able to retake control of the Company.

### b. Representations About Returning as CEO

Charney next contends that Standard General assured him that the investigation would come out in his favor and that he quickly would return as CEO

---

[108] Compl. Ex. F (Cooperation Agreement) §§ 1.1(a)-(b).

[109] *Id.* § 1.1(c). The Loan Agreements and Warrant Agreement did not include any representations that Standard General would assist Charney in retaking control, and the Notes made it an event of default to fail to comply with the terms of certain of the other Agreements. *See* Compl. Ex. C (Notes) § 11; Compl. Ex. E (Warrant Agreement).

of the Company.  Any such representation cannot be squared with the investigation process outlined in the Standstill Agreement.

Specifically, the Standstill Agreement provides that the Suitability Committee "shall oversee the investigation . . . of alleged misconduct by Charney,"[110] and that American Apparel—not Standard General—would be responsible for forming the Suitability Committee.  Further, the Standstill Agreement recites that any clearance determination to permit Charney to be reinstated as CEO would be the responsibility of the members of the Suitability Committee, acting "by majority vote and in good faith and consistent with its members' fiduciary duties."[111]  Given the express language of these provisions, Charney could not have reasonably relied on any alleged representation that Standard General would be able to control the investigation and guarantee his return as CEO.  To the contrary, that determination would be made by the members of the Suitability Committee who were obligated to comply with their fiduciary duties as directors of a Delaware corporation.

Even in the absence of an express provision acknowledging that the members of the Suitability Committee were required to act "in good faith and consistent with [their] fiduciary duties,"[112] it simply is not credible for Charney to suggest he could

---

[110] Compl. Ex. G (Standstill Agreement) § 5(a).

[111] *Id.* § 5(b)-(c).

[112] *Id.* § 5(b).

reasonably rely on a representation that guaranteed his return as CEO. The fact that the directors serving on the Suitability Committee would be required to act independently and in good faith in conducting the investigation into Charney's alleged misconduct, and could not just be a rubber stamp for Standard General or Charney, should have been palpably obvious to Charney—himself a longtime director and fiduciary of a Delaware corporation—even if Standard General had designated (which it did not) every director for appointment to the Company's board in the first place.[113]

### c.  Representation About Buying Out Standard General

Charney alleges Standard General assured him that "Charney could 'tap Standard General out' at any time by repaying the Loan, and Charney would be able to cancel all of the agreements in connection with the American Apparel 'settlement.'"[114]  Once again, it would have been unreasonable to rely on such a representation given the directly conflicting terms of the Agreements.

---

[113] Charney alleges that Standard General assured him that "the investigators would examine the conduct of the Board members who had attempted to defraud Charney." Ans. ¶ 34.  It also would be unreasonable to rely on such a representation. The investigative process detailed in the Standstill Agreement provided that the investigation would look into Charney's actions and included terms from which any reasonable person would recognize that it would be up to the members of the Suitability Committee, consistent with their delegation of authority and fiduciary obligations, to define the scope of their inquiry.

[114] Ans. ¶ 35.

In particular, Charney could not reasonably rely on a representation that he and Standard General could cancel all of the Agreements by themselves because American Apparel was a party to the Standstill Agreement and its consent would be necessary to unwind the "settlement." Significantly, the Standstill Agreement included a number of provisions for American Apparel's specific benefit, including Standard General's commitment to provide the Company with up to $25 million in additional capital or financial support, governance provisions that lasted until the completion of the 2015 annual meeting, and a process for addressing Charney's alleged misconduct and whether he should be reinstated as CEO. None of these provisions—or any other provision in the Standstill Agreement—could be amended unless "approved by a majority of the members of the [American Apparel] Board who are *not Standard General Designees*."[115]

Reinforcing the need for American Apparel's consent to cancel all of the Agreements, (1) the Standstill Agreement provides that the "Cooperation Agreement shall not be amended in any manner, terminated or suspended, directly or indirectly" to get around the terms of the Standstill Agreement,[116] and (2) the Warrant Agreement provides that "any term [thereof] may be amended, altered, modified or

---

[115] Compl. Ex. G (Standstill Agreement) § 20.

[116] *Id.* § 2(h).

waived only by an instrument in writing signed by" American Apparel.[117]   These provisions further demonstrate that Standard General and Charney alone could not cancel all of the Agreements and unwind the settlement even if they wanted to, and negate any notion that Charney could have reasonably relied on a contrary representation.[118]

### 2.    Coercion/Duress

Charney's next affirmative defense is that he "was under duress between the time [he] signed the Letter Agreement and the Standstill Agreement."[119]   Charney provides no details in his opposition to support this contention, stating only that he "received almost no consideration let alone fair consideration from the Standstill Agreement" and that "his consent was obtained by duress, fraud and coercion."[120]

---

[117] *Id.* § 7.4.

[118] Charney reprises his "buyout" theory in the promissory estoppel section of his answer, focusing on a conversation he had with Standard General's CEO on July 15, 2014 (*see* Ans. ¶ 48), after the Standstill Agreement was signed but before the Loan Agreements and the Warrant Agreement had been executed—each of which contains mutually-reinforcing integration clauses. *See supra* note 82 and accompanying text.   "Promissory estoppel does not apply, however, where a fully integrated, enforceable contract governs the promise at issue." *SIGA Techs., Inc. v. PharmAthene, Inc.,* 67 A.3d 330, 348 (Del. 2013); *see also Wilson v. Dantas*, 80 N.E.3d 1032, 1039 (N.Y. 2017) (finding that where an integrated "agreement covers the same subject matter as the alleged promise" it extinguishes an ability to rely on the promise).

[119] Def.'s Ans. Br. 10 (Dkt. 176).

[120] *Id.*

Under Delaware law, which governs the Standstill Agreement that is the focus of Charney's coercion/duress defense, "[t]here are three basic elements of a claim that coercion or duress taints the enforceability of a contract: (1) a 'wrongful' act, (2) which overcomes the will of the aggrieved party, (3) who has no adequate legal remedy to protect himself" and thereby assents to an agreement.[121] The "wrongful act" can include economic duress by the counterparty.[122] "Economic duress exists where a person is deprived of the free exercise of his will through wrongful threats or acts directed against the person's business interests."[123] Delaware Courts have noted that a party may ratify a contract it agreed to in duress by accepting the benefits flowing from it or failing to challenge it for any considerable length of time.[124]

---

[121] *Cianci v. JEM Enter., Inc.*, 2000 WL 1234647, at *9 (Del. Ch. Aug. 22, 2000) (citation omitted). The standard is similar under New York law. *See Stewart M. Muller Const. Co., Inc. v. New York Tel. Co.*, 359 N.E.2d 328, 328 (N.Y. 1976) (citing *Austin Instrument, Inc. v. Loral Corp.*, 272 N.E.2d 533, 534 (N.Y. 1971)) (agreement voidable "where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will").

[122] *E.I. DuPont de Nemours & Co. v. Custom Blending Int'l, Inc.*, 1998 WL 842289, at *4 (Del. Ch. Nov. 24, 1998) (Strine, V.C.).

[123] *Hanna Sys., Inc. v. Capano Gp., L.P.*, 1985 WL 21119, at *3 (Del. Ch. Apr. 16, 1985) ("*Hanna I*"). Under Delaware law "[p]arties are generally held to the resulting agreement, even though one has taken advantage of the other's adversity, as long as the contract has been dictated by general economic forces." *Cianci*, 2000 WL 1234647, at *10 (quoting *Restatement (Second) of Contracts* § 176 (1981)).

[124] *Cianci*, 2000 WL 1234647, at *12. Similarly, the availability of legal advice may refute a claim that a party's free will was overborne in a given situation. *Hanna I,* 1985 WL 21119, at *3.

Charney's coercion/duress defense suffers from two fatal flaws. First, Charney has failed to identify any wrongful act of Standard General that could be said to rise to the level of overcoming his free will. He does not, for example, identify any threats that Standard General made against his personal safety or his business interests of such a serious nature as to deprive him of the ability to say no to entering into the Standstill Agreement, or any of the other Agreements. Instead, Charney contends his coercion/duress defense requires "additional fact-finding."[125] This is illogical. If Charney truly believed he had been coerced into entering into the Standstill Agreement, he should be able to explain the reason why, particularly since the test "is a subjective one that focuses on the state of mind of the 'victim' of the duress."[126]

The most Charney musters as grounds for his coercion/duress defense is an allegation that he "received almost no consideration let alone fair consideration from the Standstill Agreement."[127] This allegation has nothing to do with a threat that was made against Charney to overcome his exercise of free will, but simply reflects buyer's remorse. Charney is a sophisticated businessperson who founded and served as the CEO of a public company, and who was represented by separate counsel when

---

[125] Def.'s Ans. Br. 10 (Dkt. 176).

[126] *Hanna Sys., Inc. v. Capano Gp., L.P.*, 1985 WL 21128, at *3 (Del. Ch. Nov. 29, 1985) (citing *Restatement (Second) of Contracts* § 175, cmt. c. (1981)).

[127] Def.'s Ans. Br. 10 (Dkt. 176).

he entered into the Standstill Agreement. Undoubtedly, he was disappointed when American Apparel adopted a shareholder rights plan in response to his increased shareholdings in the Company, which complicated his hope to return as the Company's CEO. He has not, however, come close to identifying a wrongful act that could be said to have overcome his free will in deciding to enter into the Agreements.

Second, Charney's coercion/duress defense fails for the independent reason that Charney did not repudiate the terms of the Standstill Agreement in a timely manner but instead treated it as valid, performed under it, and enjoyed its benefits for a considerable period until litigation ensued. The retention of benefits defeats a claim of duress or undue influence as it is "axiomatic that a party cannot both accept the benefits which accrue under a contract on the one hand and shirk its disadvantages on the other."[128] The pleadings reflect that after entering into the Standstill Agreement, Charney resigned as a member of the American Apparel board and engaged in the investigation process in an effort to vindicate himself to facilitate his return as CEO. Even when Charney's counsel wrote a letter to the Suitability

---

[128] *See Graham v. State Farm Mut. Auto. Ins. Co.*, 1989 WL 12233, at *2 (Del. Super. Ct. Jan. 26, 1989), *aff'd*, 565 A.2d 908 (Del. 1989) (a "party to a contract cannot silently accept its benefits and then object to its perceived disadvantages"), *overruled other grounds*, *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665 (Del. 2013); *Cianci*, 2000 WL 1234647, at *12 (citation omitted) ("Ratification results if the party who executed the contract under duress accepts the benefits flowing from it.").

41

Committee's counsel on December 12, 2014—just a few days before the investigation concluded—to object to how it was being conducted, Charney did not repudiate the Standstill Agreement.[129] Under Delaware law, Charney's acceptance of the benefits and protracted silence precludes a finding of duress or coercion.[130]

### 3. Unconscionability

Citing Section 2-302 of the Uniform Commercial Code, Charney advances the affirmative defense of unconscionability in his answer.[131] The basis for his invocation of that defense, however, is obscure and plainly insufficient to sustain a viable defense to the validity of any of the Agreements when they were signed.

Under Delaware law, the doctrine of unconscionability is "a limited exception to Delaware law's broad support for freedom of contract."[132] "When parties have

---

[129] Def.'s Ans. Br. Ex. 3 (Dkt. 179). Indeed, even as of June 19, 2015, Charney asserted in this Court that "[t]he plain language of the Standstill Agreement requires American Apparel to advance the fees and costs Mr. Charney incurs in defending" an action that American Apparel had brought against him for violating the Standstill Agreement. Pl.'s Opening Br. 17, C.A. No. 11098-CB (Dkt. 15); *see also Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at *3-4, 5-6 (Del. Ch. Sept. 11, 2015).

[130] *Rudnitsky v. Rudnitsky*, 2001 WL 1671149, at *6 (Del. Ch. Dec. 20, 2001); *see also Lee Builders, Inc. v. Wells,* 92 A.2d 710, 713 (Del. Ch. 1952) (finding that entry into another agreement on substantially the same terms where represented by counsel undermined plaintiff's claim that entered into prior agreement under duress). The result is the same under New York law, where a party must timely repudiate a contract. *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633 (2d Cir. 1982) (citing *Joseph F. Egan, Inc. v. City of New York*, 215 N.E.2d 490, 493 (N.Y. 1966)) (a party "claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so").

[131] Ans. ¶¶ 93-96.

[132] *James v. Nat'l Fin., LLC*, 132 A.3d 799, 812 (Del. Ch. 2016) (Laster, V.C.).

ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract."[133] In order to find an agreement unconscionable, Delaware courts must find what amounts to both substantive and procedural unconscionability[134]—"that the party with superior bargaining power used it to take unfair advantage of his weaker counterpart" and that "its terms [are] so one-sided as to be oppressive."[135]

New York law similarly recognizes two components of unconscionability: procedural and substantive unconscionability. "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract."[136] New York courts have defined an unconscionable contract as "one which is so grossly unreasonable as to be unenforceable because of an absence of meaningful

---

[133] *Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005) (Strine, V.C.), *aff'd in relevant part*, 892 A.2d 1068 (Del. 2006).

[134] *James,* 132 A.3d at 814-15 (citing *Fritz v. Nationwide Mut. Ins. Co.*, 1990 WL 186448 (Del. Ch. Nov. 26, 1990) (noting application of ten *Fritz* factors to determine whether agreement was substantively or procedurally unconscionable).

[135] *Graham*, 565 A.2d at 912 (citation omitted).

[136] *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (N.Y. App. Div. 1983).

43

choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."[137]

Here, Charney has not identified anything suggestive of either substantive unconscionability or procedural unconscionability sufficient to meet the high showing necessary to void the Agreements.[138] The defense is makeweight.

As to the substantive terms of the transaction: Standard General purchased approximately $20 million of American Apparel stock on Charney's behalf, which he pledged as collateral for a loan to make the purchases; Charney issued warrants to Standard General for roughly 10% of those shares; the parties agreed that neither could vote the shares without the consent of the other; and further agreed—along with American Apparel—to a protocol that offered Charney the opportunity to return as CEO of the Company after being suspended for misconduct.[139] On their face, these terms were not so one-sided or grossly unreasonable to warrant interfering with

---

[137] *King*, 851 N.E.2d at 1191.

[138] *See id.* (discussing how unconscionability requires a high showing and that at common law an unconscionable agreement is "one that no promisor (absent delusion) would make on the one hand and no honest and fair promisee would accept on the other")*; Ryan*, 610 A.2d at 1381-82 (Del. Ch. 1992) (Allen, C.) (finding that "American courts have continued the centuries old practice of [refusing to enforce] shockingly oppressive contracts, at least when they could find sharp practice or overreaching present" but otherwise do not intervene).

[139] *See Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 829 (N.Y. 1988) (upholding agreement where terms, "considering their commercial context, their purpose, and their effect . . . were not so overbalanced in favor of Chase as to be found substantively unconscionable").

the parties' freedom to contract.[140]  If they were, virtually any commercial transaction would be open to judicial second-guessing on the grounds of unconscionability.  Notably, totally missing from Charney's allegations are any of the hallmarks of an unconscionable contract, such as a significant disparity in price, unjust penalty clauses, inconspicuous and misleading clauses, and substantial imbalances in the parties' obligations.[141]

The undisputed facts surrounding the negotiation of the Agreements also undercut any notion of procedural unconscionability.  As discussed above, Charney's opposition is devoid of any allegations that would support a defense of coercion or duress.  To the contrary, the record reflects that Charney is a sophisticated businessman who founded and served as CEO for a public company. Before entering into any of the Agreements, Charney had been in negotiations with other potential investors, and he was represented by his own counsel at the time he negotiated and entered into the Agreements over a period of months.  Where sophisticated parties negotiate agreements over a period of time, courts "rarely will intervene."[142]

---

[140] *See Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 450 (D.C. Cir. 1965) (quoting 1 *Corbin on Contracts* § 128 (1963)) (finding that Courts intervene when "the terms are 'so extreme as to appear unconscionable according to the mores and business practices of the time and place'").

[141] *See, e.g., Fritz,* 1990 WL 186448, at *4.

[142] *James*, 132 A.3d at 826 (discussing how Delaware courts tend not to intervene where there appears to be legitimate negotiation since parties can enter into good and bad

45

For the reasons discussed above, Charney's affirmative defenses of fraudulent inducement, coercion/duress, and unconscionability fail as a matter of law. Accordingly, Standard General is entitled to a declaratory judgment that the Agreements were valid and enforceable when they were executed.

### D. The Undisputed Facts Establish that Charney Breached Provisions of the Agreements that Trigger an Event of Default Under the Notes and Make them Due and Payable

Standard General argues that it is entitled to relief under Count II of its complaint (breach of contract) because Charney breached the Notes by challenging the validity of certain of the Agreements in the California action and in this Court. According to Standard General, these breaches constitute events of default entitling Standard General to immediate payment of the principal, accrued interest, and costs and expenses due under the Notes.[143]

---

contracts unless "the contract appears fundamentally unfair and there are valid reasons to suspect that the outcome did not result from legitimate negotiation"); *accord Gillman,* 534 N.E.2d at 828.

[143] Standard General offered additional grounds for an event of default that I do not address, including that Charney failed to deliver to Standard General the pledged shares and warrant certificates, and attempted to launch a proxy contest in violation of the Standstill Agreement. Compl. ¶ 72; Pls.' Opening Br. 3-4; Hearing Tr. 8-10 (Sept. 19, 2017) (Dkt. 200). Charney tersely denies these contentions even though they involve certain events (*e.g.*, delivering pledged shares and warrant certificates) that would not seem to lend themselves to controversy.

46

The principal amount and accrued interest of the Notes are not due until June 26, 2019, except "after the happening of any Event of Default."[144]  Upon the occurrence of "any Event of Default," Standard General is entitled to declare all "amounts payable [on the Notes] to be immediately due and payable . . . without presentment, protest, demand or notice."[145]  Section 11 of the Notes sets forth events of default.  Relevant here are Sections 11(b) and 11(f).

Section 11(b) provides that an event of default occurs if Charney fails "to perform or observe any other covenant, agreement, term or obligation . . . under . . . the Cooperation Agreement or the Warrant Agreement" and such failure continues ten days after notice is given.[146]  Section 7.10 of the Warrant Agreement and Section 3.13 of the Cooperation Agreement both provide that each of the parties to those agreements "agrees that it shall not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than the Court of Chancery or other federal or state courts of the State of Delaware."[147]

Charney indisputably breached these provisions by filing the California action, in which Charney asks the California court to determine, among other things, that "the Agreements [including the Warrant Agreement and the Cooperation

---

[144] Compl. Ex. C (Notes) §§ 1, 4, 11.

[145] *Id.* § 11.

[146] *Id.* § 11(b).

[147] Compl. Ex. E (Warrant Agreement) § 7.10; Ex. F (Cooperation Agreement) § 3.13.

Agreement][148] with American Apparel and Standard General which limit Charney's rights relating to the Company were procured by fraud, and therefore are null and void and of no force or effect."[149]  These breaches in turn triggered an event of default under Section 11(b) of the Notes, making the principal and accrued interest under the Notes immediately due and payable.[150]  Standard General emphasizes (and I agree) that these breaches are not just technical because Standard General needlessly has been put through the burden and expense of litigating claims in California that Charney unequivocally agreed to litigate only in Delaware.[151]

Charney does not dispute that he breached the Delaware exclusive forum provisions in the Warrant and Cooperation Agreements by filing the California action.  By way of defense, he contends only that he did not receive the notice required under Section 11(b).[152]  This argument is frivolous.  The complaint in this action expressly alleges that Charney's filing of the California action gave rise to an

---

[148] CA Compl. ¶¶ 86, 98 (defining "Agreements" to include the Warrant Agreement and the Cooperation Agreement).

[149] *Id*. ¶ 190(f); *see also id.* ¶ 142 (seeking rescission of Warrant Agreement), ¶ 171 (seeking rescission of Warrant Agreement and Cooperation Agreement), Prayer for Relief ¶ 5 (for a determination that the Agreements have been rescinded), Prayer for Relief ¶ 7(f) ("the Agreements were procured by fraud, and there are null and void and of no further force or effect.").

[150] Compl. Ex. C (Notes) § 11(b).

[151] Hearing Tr. 29-30 (Sept. 19, 2017) (Dkt. 200).

[152] *See id.* 54-55.

event of default under Section 11 of the Notes,[153] and the record reflects that the complaint was served on Charney via Federal Express on July 15, 2015, at the address specified in the Notes.[154] Despite being put on notice of his breach of Section 11(b) more than two years ago, Charney has refused to withdraw his complaint in California and, to the contrary, repeatedly has stated his intention to press his claims in that forum in contravention of the express terms of the Delaware exclusive forum provisions.

Section 11(f) of the Notes provides that it is an event of default if the "Pledge Agreement shall at any time after its execution and delivery for any reason . . . [have its validity or enforceability] be contested by the Borrower or the Borrower shall deny he has any further liability or obligation under the Pledge Agreement or the Borrower shall fail to perform any of his obligations thereunder."[155] Charney breached this provision in two respects. He first breached it by filing the California action in which he challenged the validity of the Pledge Agreement,[156] along with

---

[153] Compl. ¶ 81.

[154] Aff. of Service ¶ 2 & Ex. A (documenting service of Charney at 1809 Apex Avenue, Los Angeles, CA 90026) (Dkt. 6); *see also* Compl. Ex. C (Notes) § 16 & Schedule 1 (requiring that notice be sent to Charney at 1809 Apex Avenue, Los Angeles, CA 90026).

[155] Compl. Ex. C (Notes) § 11(f).

[156] CA Compl. ¶ 190(f) (seeking declaration that "the Agreements were procured by fraud, and therefore are null and void and of no force or effect"); Prayer for Relief ¶ 5 (seeking determination "that said Agreements have been rescinded" because they were fraudulently induced); Prayer for Relief ¶ 7(f) (same). The California complaint defines the term "Agreements" twice, but only one of those definitions includes the Pledge Agreement. *See*

other Agreements, as discussed above. He breached the provision a second time by asserting in this action that all of the Agreements, including the Pledge Agreement, are unenforceable. More specifically, Charney explicitly challenges the validity of the Pledge Agreement in this action by, among other things, asserting as an affirmative defense that the Agreements (including the Pledge Agreement) were procured by fraud and by seeking an order "denying Standard General all relief."[157]

For the reasons explained above, the undisputed facts of record establish that, barring application of an affirmative defense, Standard General is entitled to judgment in its favor on Count II of its complaint for the principal amount of the Notes and accrued interest. In its brief, Standard General also seeks an award for "attorneys' fees as provided by the Agreements."[158] Standard General failed, however, to offer any evidence as to the magnitude of attorneys' fees it was seeking or how those fees were payable under the Agreements. Given the lack of any meaningful attention to the issue, I decline to award Standard General attorneys' fees on this motion.

---

*id.* ¶ 86. Given the wholesale challenge Charney has mounted to the transactions he entered into with Standard General, and the specific reference to the Pledge Agreement in paragraph 86 of the California complaint, it seems plain that Charney is challenging the validity of the Pledge Agreement in the California action.

[157] Ans. ¶¶ 15-43, 93-96 & Prayer for Relief.

[158] Pls.' Opening Br. 56.

I now turn to Charney's affirmative defenses that are relevant to Count II, namely: breach of contract, breach of the implied covenant of good faith and fair dealing, failure to mitigate, promissory estoppel, and unclean hands.

### 1. Breach of Contract Affirmative Defense

Charney asserts that he "is excused from performance under the Loan by virtue of Standard General's breaches of contract."[159] Charney identified three alleged breaches, each of which relates to the Standstill Agreement: (1) that Standard General failed to "timely invest" $25 million in American Apparel, (2) that the investigation into Charney's alleged misconduct was not conducted in accordance with the terms of the Standstill Agreement, and (3) that Standard General failed (or caused American Apparel to fail) to provide reimbursement for his expenses.[160]

The Standstill Agreement is governed by Delaware law.[161] "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[162] In order for a breach to excuse performance by a counterparty, the

---

[159] Ans. ¶¶ 68-71.

[160] Ans. ¶¶ 69-70; Def.'s Ans. Br. at 2-3 (Dkt. 176).

[161] Compl. Ex. G (Standstill Agreement) §§ 11, 13.

[162] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (citing *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995)).

breach by the party seeking performance must be material.[163]  This Court has treated a prior material breach as an affirmative defense.[164]

As explained below, each of Charney's theories of prior material breach fails either because he has failed to plead facts to demonstrate a prior material breach by Standard General, or because the actions about which he complains do not implicate a contractual obligation owed by Standard General.

### a.  Standard General's Investment Obligation

Charney argues that Standard General breached the Standstill Agreement by failing to "timely invest" $25 million in American Apparel.[165]  The relevant provision of the Standstill Agreement states as follows:

> Standard General commits to timely provide, or to cause one or more of its Affiliates (other than Charney) or third parties approved by the Company to provide, additional capital or other financial support to the Company in an aggregate amount up to $25 million, (i) to the extent necessary to permit the Company to repay amounts due under the [Lion] Credit Agreement . . . and amounts related thereto . . . and (ii) for any other purposes as the Board, following the Director Appointments, may determine are appropriate.[166]

---

[163] *In re Mobilactive Media, LLC*, 2013 WL 297950, at \*13 (Del. Ch. Jan. 25, 2013) (citation omitted) ("[A] slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract.").

[164] *See All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at \*6 (Del. Ch. Aug. 9, 2004), *aff'd*, 880 A.2d 1047 (Del. 2005) (discussing prior material breach as a "defense").

[165] Ans. ¶ 69; Def.'s Ans. Br. at 2-3 (Dkt. 176).

[166] Compl. Ex. G (Standstill Agreement) § 2(a).

As to the first part of this provision, it is undisputed that Standard General purchased Lion Capital's loan for approximately $9.5 million on July 16, 2014, just one week after Standard General entered into the Standstill Agreement.[167]  Thus, the record shows that Standard General satisfied its obligation with respect to that loan.

As to the second part of the provision, it also is undisputed that Standard General invested an additional $15 million in American Apparel, thereby satisfying the "up to $25 million" requirement.[168]  Charney's grievance is not that the additional investment was never made, but that it should have been made about three months sooner than it was.[169]  Critically, the Standstill Agreement makes clear, as Charney conceded,[170] that Standard General's obligation to invest additional funds was predicated upon the reconstituted American Apparel board making a request for the funds as it "may determine are appropriate."[171]  Given this requirement, Charney's failure to allege any facts concerning when the board made such a request is fatal as it precludes a finding that the investment was not timely.  Accordingly, Charney has

---

[167] Hearing Tr. 86-87 (Sept. 19, 2017) (Dkt. 200).

[168] Ans. ¶ 69.

[169] As noted above, Standard General contends it invested the $15 million in March 2015, and Charney contends it should have been invested by December 2014.  *See supra* note 31.

[170] Hearing Tr. 88 (Sept. 19, 2017) (Dkt. 200).

[171] Compl. Ex. G (Standstill Agreement) § 2(a).

failed to plead a viable breach of contract defense with respect to Standard General's investment obligation.

### b. The Investigation of Charney's Alleged Misconduct

Charney asserts that the investigation into his alleged misconduct was not conducted in accordance with the terms of the Standstill Agreement.[172] More specifically, Charney complains that he did not receive access to his e-mail or the required preliminary hearing under Section 5(c) of the Standstill Agreement.[173]

Even assuming that Charney has pled sufficient facts to support these contentions, they fail to state a contractual defense against Standard General because the plain language of the Standstill Agreement shows that the members of the Suitability Committee—not Standard General—were responsible for conducting the investigation into Charney's alleged misconduct.

The Standstill Agreement provides that American Apparel was to form the Suitability Committee and that the Suitability Committee was responsible for overseeing the investigation and for making the determination of whether Charney should be reinstated as CEO:

> No later than one business day following the Director Resignations, *the Company* [American Apparel] *shall* form a committee of the Board (the "Suitability Committee") consisting of David Danziger, one Standard General Designee and one Joint Designee. All decisions of the

---

[172] Ans. ¶ 70; Def.'s Ans. Br. at 2-3 (Dkt. 176).

[173] Ans. ¶ 77; Hearing Tr. 60-61 (Sept. 19, 2017) (Dkt. 200).

Suitability Committee shall be made by majority vote of the members of the Suitability Committee. The Suitability Committee shall oversee the investigation (the "Investigation") of alleged misconduct by Charney.

\* \* \* \* \*

Based on the findings of the Investigation, the Suitability Committee shall determine, by majority vote and in good faith consistent with its members' fiduciary duties, whether it is appropriate under the circumstances for Charney to be reinstated as CEO of the Company or serve as an officer or employee of the Company or any of its subsidiaries (the "Clearance Determination").[174]

Under the terms of the Standstill Agreement, Standard General's sole role with respect to the investigation was to identify individuals (three of its own choosing and two who would be mutually agreeable to Standard General and American Apparel) to be appointed to the reconstituted board.[175] Nothing suggests Standard General failed to do so. These five individuals, along with two continuing directors (David Danziger and Allan Mayer),[176] comprised the reconstituted American Apparel board that was responsible for selecting the three members of the Suitability Committee. It was the Suitability Committee members who in turn were responsible for conducting the investigation in accordance with their fiduciary duties, as set forth above.

---

[174] Compl. Ex. G (Standstill Agreement) §§ 5(a)-(b).

[175] *Id.* §§ 1(b), 5(a).

[176] *Id.* § 1(b).

Thus, Standard General had no contractual responsibility for the manner in which the investigation was conducted. Any grievance on that score would have to be directed to the American Apparel directors on the Suitability Committee, including any complaint of a failure to provide a preliminary hearing or access to email, which were similarly the responsibility of the Suitability Committee.[177]

### c. Failure to Provide Timely Reimbursement

Charney asserts, without reference to any specific contractual obligation, that Standard General "caused American Apparel to fail and refuse to provide reimbursement" to which he was entitled "under his employment contract and the Standstill Agreement" to defend himself in connection with the Suitability Committee's investigation.[178] This conclusory allegation, on its face, does not state cognizable grounds for a breach of contract defense against Standard General. Furthermore, insofar as the Standstill Agreement is concerned, I previously ruled in a separate action that the Standstill Agreement does not provide "an independent source of a right to advancement" and that it "merely confirmed preexisting rights to indemnification."[179]

---

[177] *Id.* § 5(c) (noting that the "Suitability Committee shall provide" the opportunity for a preliminary hearing, and be responsible for providing "specific authorization" to enable access to the Company's computer systems).

[178] Ans. ¶ 70.

[179] *Charney v. Am. Apparel, Inc.*, 2015 WL 5313769, at *1, 4-6.

## 2. Breach of Implied Covenant of Good Faith and Fair Dealing Affirmative Defense

The last affirmative defense Charney included in his answer is the implied covenant of good faith and fair dealing. Charney asserts that Standard General breached the implied covenant because it failed to "assist Charney in regaining control of American Apparel."[180]

Under both New York and Delaware law, the implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract."[181] But the implied covenant cannot be used to "create a 'free-floating duty . . . unattached to the underlying legal document'"[182] or enforce terms that "would be inconsistent with other terms of the contractual relationship."[183]

Here, there was nothing in the Agreements that created an obligation to "assist Charney in regaining control of American Apparel."[184] Charney identifies no gap in the contract or obligation the parties would have agreed to had they considered the

---

[180] Ans. ¶ 98.

[181] *Wilgus*, 498 A.2d at 159 (citing *Restatement (Second) of Contracts* § 205 (1981)); *accord Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 513-14 (N.Y. App. Div. 1999).

[182] *Dunlap*, 878 A.2d at 441 (*quoting Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. App. Div. 1994)).

[183] *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 292 (N.Y. 1995) (quoting *Murphy v. Am. Home Products Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)).

[184] Ans. ¶ 98.

57

issue.[185]  At bottom, Charney's conclusory-pled implied covenant of good faith "defense" amounts to an impermissible effort to create an obligation that would be inconsistent with the structure and terms of the Agreements, discussed above.[186] Accordingly, the defense fails as a matter of law.

### 3.    Failure to Mitigate Affirmative Defense

Charney asserts that Standard General cannot collect the amounts due under the Notes because Standard General failed to mitigate its harm.[187]  Charney's failure to mitigate defense is unavailing because there is no duty to mitigate under New York law, which governs both of the Notes,[188] where there is a valid liquidated damages clause.[189]

---

[185] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) ("The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."); *Forman v. Guardian Life Ins. Co. of Am.*, 76 A.D.3d 886, 887-88 (N.Y. App. Div. 2010) (finding that implied covenant sufficiently plead where being used to fill gap between agreements).

[186] *See supra* III.C.1 (analysis of fraudulent inducement defense).

[187] Ans. ¶¶ 80, 89-90.  Charney's failure to mitigate theory argues that Standard General is not entitled to full damages since it "blocked Charney from actively pursuing necessary" means to help the Company and otherwise prevented him from taking steps that would have reduced the harm American Apparel suffered.  *Id.* ¶¶ 80, 82, 86, 90.  To the extent that Charney claims that Standard General was required to give up its clear contractual rights, such an argument is unavailing.  *See Corbin on Contracts* § 5715 at 344 (rev. ed. 2005) ("Courts have generally held that it is not necessary for the plaintiff to make another contract with the defendant who has repudiated, even though he offers terms that would result in avoiding loss.").

[188] Compl. Ex. C (Notes) §§ 20-21.

[189] *Crown IT Servs., Inc. v. Koval-Olsen*, 11 A.D.3d 263, 265-266 (N.Y. App. Div. 2004).

Under New York law, if there is a valid liquidated damages clause, the amount that is due to the non-breaching party will not be reduced based upon a failure to mitigate:

> An acceleration clause is one type of liquidated damages provision, which . . . requires a party who defaults on installment payments to pay the balance of the debt in one lump sum. Parties frequently agree to acceleration clauses, and New York courts typically enforce such provisions according to their terms.[190]

Whether an acceleration clause "represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances."[191]  In determining whether a clause is a penalty, courts look to whether "the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation."[192]  The burden lies with the party opposing the liquidated damages to proffer evidence that would suggest the provision is unconscionable or punitive since, "as a general matter parties are free to agree to a liquidated damages

---

[190] *See, e.g., Rattigan v. Commodore Int'l Ltd.,* 739 F. Supp. 167, 169-70 (S.D.N.Y. 1990) (finding plaintiff employee entitled to accelerated contract benefits following his involuntary resignation); *Fifty States Mgmt. Corp. v. Pioneer Auto Parks. Inc.,* 389 N.E.2d 113, 115 (N.Y. 1979) (enforcing acceleration of remaining monthly rent due under 20-year lease where defendant willfully breached); *Key Int'l Mfg. v. Stillman,* 103 A.D.2d 475, 478-80 (N.Y. App. Div. 1984) *aff'd in relevant portion*, 489 N.E.2d 764 (N.Y. 1985) (allowing acceleration of a ten-year $2 million debt where plaintiff neglected to renew annual letters of credit per contract).

[191] *JMD Holding Corp. v. Congress Fin. Corp.,* 828 N.E.2d 604, 609 (N.Y. 2005).

[192] *Truck Rent-A-Ctr.*, 361 N.E.2d at 1018.

clause 'provided that the clause is neither unconscionable nor contrary to public policy.'"[193]

Charney has failed to provide evidence that the liquidated damages provision is unconscionable or punitive, or that the amount payable in the event of a breach is "grossly disproportionate to the amount of actual damages."[194] To the contrary, the amount payable upon an event of default correlates precisely to the amount payable in the event of Charney's performance, *i.e.*, the principal of the Notes and accrued interest.[195] Where "the clause 'is intended by the parties to operate in lieu of performance,'"[196] instead of being used as a threat to compel performance,[197] courts

---

[193] *172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 25 N.E.3d 952, 957 (N.Y. 2014) (quoting *Truck Rent-A-Ctr.*, 361 N.E.2d at 1018).

[194] *Truck Rent-A-Ctr*, 361 N.E.2d at 1018.

[195] Compl. Ex. C (Notes) §§ 1, 3.

[196] *Rattigan,* 739 F.Supp. at 169 (quoting *Brecher v. Laikin,* 430 F.Supp. 103, 106 (S.D.N.Y. 1977)).

[197] *Fifty States Mgmt. Corp.,* 389 N.E.2d at 116 (enforcing contract since damages under clause "no greater than the amount [defendant] would have paid had it fully performed" its obligations under the contract).

will enforce it.[198]   Because the acceleration clause in the Notes is valid, Standard

General owed no duty to mitigate under the Notes.[199]

### 4.      Promissory Estoppel Affirmative Defense

Charney asserts that Standard General is estopped "from seeking money

from" him under the doctrine of promissory estoppel.[200] Focusing on the time period

after the Agreements were executed,[201] Charney identifies only one alleged promise

that was made to him:   that Standard General's CEO (Soo Kim) sent him a text

message on September 16, 2014, stating: "You are welcome to take me out.  I am a

man of my word."[202]

---

[198] Although New York courts have been hesitant to award damages if a breach is trivial compared to the harm, that is not the case here.  As explained above, supra notes 59-60, Charney has steadfastly refused to honor express Delaware exclusive forum provisions— even after this suit was filed taking him to task for doing so—causing  Standard General to bear the burden and expense associated with litigating claims in California that should not have been filed there.

[199] Even if a duty to mitigate did exist here, such a duty only would require "reasonable" efforts to mitigate.  Taking the facts Charney plead as true and drawing all reasonable inferences in his favor, Charney fails to show that Standard General failed to act reasonably to mitigate any harm relating to the Notes or the other Agreements.  *See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,* 47 A.D.3d, 107-08 (N.Y. App. Div. 2007); 11 *Corbin on Contracts* § 5715 at 344 (rev. ed. 2005) ("[c]ourts have generally held that it is not necessary for the plaintiff to make another contract with the defendant who has repudiated, even though he offers terms that would result in avoiding loss.").

[200] Ans. ¶ 44.

[201] The promises that allegedly were made to Charney before he entered the Agreements are addressed in Section III.C.1.

[202] Def.'s Ans. Br. 7.

To establish promissory estoppel under New York law, a party must show "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance."[203] Delaware law is similar. A "plaintiff must show by clear and convincing evidence that:"

> (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[204]

Charney's promissory estoppel "defense" fails for three reasons. First, Charney's allegation concerning a September 16, 2014 text message does not appear in his pleading, and it is impermissible to attempt to amend one's pleading through a brief.[205]

Second, the alleged "promise" is too amorphous to be enforced. No specifics are provided concerning any of the financial or other terms under which Standard General allegedly was willing to be "taken out." Nor are any specifics provided as

---

[203] *Ripple's of Clearview, Inc. v. LeHavre Associates*, 88 A.D.2d 120, 122 (N.Y. App. Div. 1982).

[204] *Souder,* 748 A.2d at 399.

[205] *See Orman v. Cullman,* 794 A.2d 5, 28 & n.59 (Del. Ch. 2002) ("[A]ny attempt contained within [briefs] to plead new facts or expand those contained in the complaint will not be considered."). Charney asserts, without citation, that this "fact is cited in [his] June 22, 2016 answer" (Def.'s Ans. Br. 7), but I was unable to find any reference to a September 2014 text message in his answer.

to how such a transaction could be implemented, which is particularly significant given that American Apparel's consent was necessary to modify the Standstill Agreement or the Warrant Agreement.[206]

Finally, "the more routine role of promissory estoppel should be to assure that those who are reasonably induced to take injurious action in reliance upon a non-contractual promise receive recompense for that harm."[207] Thus, even assuming that the text message constituted an enforceable promise, it would make no sense to excuse Charney from repaying an approximately $20 million credit obligation as a result. Indeed, such a result would be an injustice and turn the doctrine of promissory estoppel—the purpose of which is "to prevent injustice"[208]—on its head.

### 5. Unclean Hands Affirmative Defense

Finally, Charney's invocation of the doctrine of unclean hands clearly fails as a defense to Count II. Under both New York and Delaware law, "the 'unclean hands' doctrine bars equitable, but not legal, relief."[209] Because Count II seeks money

---

[206] *See supra* Section III.C.1.c.

[207] *Ramone v. Lang*, 2006 WL 905347, at *14 (Del. Ch. April 3, 2006) (Strine, V.C.).

[208] *Souder,* 748 A.2d at 398.

[209] *Lehman Bros. Hldgs., Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *7 & n.47 (Del. Ch. Feb. 25, 2014) (citation omitted), *aff'd*, 105 A.3d 989 (Del. 2014); *see also Cohn & Berk v. Rothman-Goodman Mgmt. Corp.*, 125 A.D.2d 435, 436 (N.Y. App. Div. 1986) (discussing how unclean hands applies to equitable relief); *Manshion Joho Ctr. Co., Ltd. v. Manshion Joho Ctr., Inc.,* 24 A.D.3d 189, 189 (N.Y. App. Div. 2005) ("unclean hands" inapplicable in action for damages).

damages—a quintessentially legal form of relief—Charney's unclean hands defense fails a matter of law.

* * * * *

For the reasons discussed above, Charney's affirmative defenses for breach of contract, breach of the implied covenant of good faith and fair dealing, failure to mitigate, promissory estoppel, and unclean hands do not bar relief under Count II. Accordingly, Standard General is entitled to judgment in its favor under Count II of its complaint for the principal amount of the Notes and accrued interest.

## IV. CONCLUSION

For the reasons explained above, Standard General is entitled under Count I of its complaint to a declaratory judgment that the Agreements were valid and enforceable when they were executed and, under Count II of its complaint, to a judgment in its favor for the principal amount of the Notes and accrued interest. As noted above, it appears that Counts III and IV of the complaint are moot.

The parties are directed to confer and submit an implementing order, which should be in the form of a final judgment if no further relief is sought under Counts III and IV, within ten business days of the date of this opinion.

**IT IS SO ORDERED.**